UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEE ANN MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-00166-JRS-DLP |
| | ) | |
| THE HARTFORD LIFE AND ACCIDENT | ) | |
| INSURANCE CO., | ) | |
| SPRINGLEAF FINANCE, INC. DISABIL- | ) | |
| ITY PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motions for Summary Judgment (ECF Nos. 50, 52)**

Plaintiff Dee Ann Miller ("Miller") brings this action under the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to challenge the termination of her long-term disability benefits under the Group Long Term Disability Plan for Employees of Springleaf Finance, Inc. (the "Plan") by the Plan's administrator, Defendant The Hartford Life and Accident Insurance Co. ("Hartford"). The parties' cross-motions for summary judgment are fully briefed and ripe for decision. Having carefully reviewed the administrative record, as well as the parties' memoranda, responses, and replies, the Court concludes that Hartford's motion (ECF No. 52) should be **granted** and Miller's motion (ECF No. 50) should be **denied** for the following reasons.

# I. Background

## *A. The Plan*

Miller worked as a senior collector for Springleaf Finance, Inc. beginning in 1997 and received long-term disability coverage under the Plan. (R. 22, ECF No. 49-1 at 23; R. 867, ECF No. 49-4 at 21).[1] The Plan is funded by a group insurance policy issued by Hartford and grants Hartford discretionary authority to determine eligibility for benefits and interpret the Plan's terms. (R. 234, 248, ECF No. 49-1 at 235, 249.)

The Plan defines "Disability or Disabled" as

> You are prevented from performing one or more of the Essential Duties of:
>
> 1) Your Occupation during the Elimination Period;
>
> 2) Your Occupation, for the 24 months following the Elimination Period, and as a result, Your Current Monthly Earnings are less than 80% of Your indexed Pre-disability Earnings; and
>
> 3) after that, Any Occupation.

(R. 249, ECF No. 49-1 at 250.) The Plan defines "Your Occupation" as "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer at a specific location." (R. 252, ECF No. 49-1 at 253.) The Plan also provides that benefits are limited to 24 months

---

[1] The administrative record in this case—comprising 2,835 pages filed in ten parts (ECF Nos. 49-1 to 49-10)—is numbered sequentially from HART00001 to HART02835. For brevity, "HART" and any leading zeroes have been omitted from citations to the record.

for disability due to "Mental Illness that results from any cause" or "any condition that may result from Mental Illness." (R. 239, ECF No. 49-1 at 241.)

## B. "Your Occupation"

The parties do not appear to dispute the essential duties of Miller's occupation. Miller's job description as senior collector at Springleaf provided:

**Job Functions / Responsibilities** (list in order of importance):

| | % | Function |
|---|---|---|
| 1 | 70 | Initiate contact with customers, and external third parties (e.g. collection agencies, appraisers, legal firms, brokers, etc.), as warranted, to arrange for repayment and/or settlement of delinquent accounts according to FDCPA and/or RESPA guidelines and applicable collection laws. |
| | | Respond to inquiries from internal personnel, customers and external third parties (e.g. courts, agencies, realtors, brokers, attorneys, etc.). |
| | | Maintain and notate all appropriate information and documentation regarding customer and account status on computer system and provide same to others involved in collection of account. |
| | | Analyze account status to determine appropriate collection strategy. |
| 2 | 12 | Create and respond to correspondence and documentation to and from a variety of sources (e.g. brokers, realtors, appraisers, customers, agencies, legal firms, bankruptcy courts, etc.) regarding delinquent accounts. |
| 3 | 8 | Obtain appropriate information to proceed in further collection activity including skip-tracing procedures. |
| 4 | 5 | Complete necessary reports on a daily basis. |
| 5 | 1 | Maintains Appropriate Position Documentation. |
| 6 | 4 | Performs all other duties as assigned by Management. |
| | 100% | |

(R. 321–22, ECF No. 49-2 at 34–35.) According to an occupational analysis completed by Hartford's vocational rehabilitation clinical case manager, the essential duties of Miller's occupation *as it is recognized in the general workplace* "include contacting

3

customers with high risk accounts, negotiating repayment, providing documentation to monitor results and productivity of collection efforts, responding to inquiries, analyzing account status and obtaining information needed." These duties require the ability "to occasionally reach and handle, frequently finger, and constantly talk and hear." (R. 179–80, ECF No. 49-1 at 180–81.) The Dictionary of Occupational Titles classifies the position as "sedentary, semiskilled work." (R. 1124, ECF No. 49-4 at 278.)

### C. *Hartford's approval of Miller's short-term disability benefits claim*

On March 5, 2014, Miller received a performance appraisal, which concluded that Miller's performance "Needs Improvement." In that appraisal, Miller's supervisor commented: (1) that Miller "fails to use her time wisely when she is at work. She is known to be in Aux work frequently and also utilizes her time doing other things besides work related items"; (2) that Miller "has a tendency to be hesitant to accept when a new rule/policy has been put in place and typically refers to how things used to be with her previous boss[ ] when ultimately it is irrelevant and things just need to be accepted"; (3) that Miller "has little interest in her position"; and (4) that the supervisor "would like to see [Miller] use her time more wisely while on company time." (R. 328, ECF No. 49-2 at 672.)

Miller would not return to work thereafter. (R. 867, ECF No. 49-4 at 21.) Instead, five days later, Miller applied for short-term disability benefits, (R. 864, ECF No. 49-4 at 18), and visited her primary care physician, Dr. Judi Brezausek, complaining of depression. (R. 888, ECF No. 49-4 at 42.) In connection with Miller's application for

short-term disability benefits, Dr. Brezausek submitted an "Attending Physician's Statement of Functionality" indicating that Miller's primary diagnosis was depression and her secondary diagnosis was fibromyalgia.[2] (R. 911, ECF No 49-4 at 65.) Dr. Brezausek reported that Miller could sit for two hours at a time—though did not indicate how many hours per day total—and that Miller could lift or carry up to ten pounds without restriction and could occasionally reach, finger, and handle with both hands. (*Id.*) Dr. Brezausek further noted that Miller was "depressed, fatigued, cannot sleep well," and that her symptoms were "increasing due to her fibromyalgia pain" as well as work- and family-related stress. (*Id.*) Dr. Brezausek started Miller on Pristiq (50 mg) for depression and set her expected return to work date as April 7, 2014. (R. 890, 912, ECF No. 49-4 at 44, 66.) Hartford approved Miller's claim for short-term disability benefits on March 13, 2014, effective March 17 through April 6, 2014. (R. 880, ECF No. 49-4 at 34.)

Hartford would extend Miller's short-term disability benefits multiple times over the following six months, ultimately exhausting Miller's short-term disability coverage on September 7, 2014. (R. 869, ECF No. 49-4 at 23.) Over this period, Miller visited Dr. Brezausek on several occasions, and Dr. Brezausek submitted several statements to Hartford in support of Miller's continuing disability. On March 27,

---

[2] Although Miller asserted a mental-illness disability in her initial claim and appeal, as well as her Social Security Disability claim, she does not claim such disability in this suit. Nevertheless, extensive discussion of the mental-illness claim and related records is necessary here because they (1) provide necessary background to Hartford's decisions at the various stages of administrative adjudication, (2) provide necessary background to Hartford's decision to discredit Miller's self-reported limitations and her treating physician's opinions, and (3) provide grounds to distinguish the Social Security Administration's findings from Hartford's findings on remand.

2014, Miller visited Dr. Brezausek complaining of depression and reported that Pristiq had "helped the depression, but her pain is worse this week. No energy. Could hardly walk in here." (R. 892, ECF No. 49-4 at 46.) The next day, Dr. Brezausek submitted an "Attending Physician's Statement of Continued Disability (For Mental Health Claims)," again indicating that Miller suffered from depression and fibromyalgia and reporting Miller's symptoms as "fatigue, emotional lability, [and] difficulty concentrating." (R. 2289, ECF No. 49-9 at 76.) Dr. Brezausek's "Current Mental Status Examination" of Miller indicated that Miller was well-groomed and cooperative; that Miller's speech was normal, her thought process was "Logical/Coherent," her insight into her illness was good, her psychomotor activity was within normal limits but with "(some) agitation," and her attention, concentration, and memory were intact. (*Id.*) Nevertheless, Dr. Brezausek reported that Miller could "barely perform [activities of daily living]" and could work zero hours per day, setting her target date for return to work as May 5, 2014. (R. 2290, ECF No. 49-9 at 77.) Hartford extended Miller's short-term disability benefits through May 5, 2014. (R. 879, ECF No. 49-4 at 33.)

Miller visited Dr. Brezausek again the following month for follow-up on her fibromyalgia. (R. 894, ECF No. 49-4 at 48.) Miller complained of pain in her knees, legs, shoulders, and back. Miller further complained that she felt "cloudy-headed," that she had to leave herself "a lot of notes," and that she felt "like she isn't safe driving" because she "puts the car in drive instead of reverse," (*id.*), though it does not appear that Dr. Brezausek ever restricted Miller from driving. Two days later,

Dr. Brezausek sent a message to a colleague stating, "Darn it. [Miller] is positive for Chronic Fatigue Immunodeficiency Syndrome (CFIDS)," and asking the colleague to "[l]et [Miller] know that I will fill out her Hartford paperwork, but that we have heard through the grapevine that she may have her job in jeopardy." (R. 897, ECF No. 49-4 at 51.)

That same day, Dr. Brezausek submitted another "Attending Physician's Statement of Continued Disability (For Mental Health Claims)," indicating that Miller suffered from depression, fibromyalgia, and chronic fatigue, with symptoms including "fatigue, emotional lability, [and] difficulty concentrating." (R. 2291–92, ECF No. 49-9 at 78–79.) Dr. Brezausek's "Current Mental Status Examination" again indicated that Miller was well-groomed and cooperative and that Miller's speech was normal, her thought process was "Logical/Coherent," her insight into her illness was good, and her attention and memory were intact. (R. 2291, ECF No. 49-9 at 78.) However, Dr. Brezausek checked a box describing Miller's psychomotor activity as "Retardation," with a handwritten notation "slow to answer," and indicated Miller's concentration was "impaired: mild." (*Id.*) Dr. Brezausek again reported that Miller could "barely perform [activities of daily living]" and could work zero hours per day, setting her target date for return to work as June 2, 2014. (R. 2292, ECF No. 49-9 at 79.) On May 22, 2014, Hartford extended Miller's short-term disability benefits through July 13, 2014. (R. 875, ECF No. 49-4 at 29.)

On May 28, 2014, Miller again visited Dr. Brezausek for a follow-up on her depression. (R. 835, ECF No. 49-3 at 261.) Miller complained of pain in her left leg,

which would subside only when she lay back, and reported that she thought "pain is causing more of her depression." (*Id.*) Dr. Brezausek found that Miller was "alert, cooperative," and in "no distress," with "extremities normal, atraumatic, no cyanosis or edema," and a "[g]rossly normal" neurologic exam except for "[d]ampened reflex on left" and "weakness at left great toe." (*Id.*) On August 14, 2014, Hartford extended Miller's short-term disability benefits through September 7, 2014, exhausting those benefits. (R. 869, ECF No. 49-4 at 23.)

## D. Hartford's initial approval of Miller's long-term disability benefits claim

On July 9, 2014, Hartford notified Miller that it would begin investigating her eligibility for long-term disability benefits and interviewed Miller by telephone. (R. 152, ECF No. 49-1 at 153; R. 870, ECF No. 49-4 at 24.) Miller reported symptoms of pain, lack of energy, and confusion, as well as limitations including difficulty walking, inability to sit for 20 minutes, and inability to clean, leave the house, or even watch television. (R. 153, ECF No. 49-1 at 154.) Miller further reported that she thought her illness was "because of stress from work—a new company took over so jobs were changed." (*Id.*)

The next day, Dr. Brezausek submitted three forms in support of Miller's long-term disability claims based on Miller's June 30, 2014, office visit. In her notes for that visit, Dr. Brezausek reported that Miller complained of fatigue, leg pain, and numbness in her toes. (R. 837, ECF No. 49-3 at 263.) Dr. Brezausek found that Miller was "alert, cooperative, no distress," and had normal range of motion in her back but reported no examination of Miller's extremities. (*Id.*)

Dr. Brezausek completed a "Physical Capacities Evaluation Form" indicating that Miller could occasionally handle, finger, and feel with both hands, but could sit for no more than two hours per day, could stand and walk for less than one hour per day, and "becomes easily exhausted [and] experiences leg pain[,] so harsh physical activity cannot be done." (R. 2293–94, ECF No. 49-9 at 80–81.) That same day, Dr. Brezausek submitted another "Attending Physician's Statement of Continued Disability (For Mental Health Claims)," indicating that Miller suffered from depression, fibromyalgia, and chronic fatigue, could work for zero hours per day, and could "barely perform [activities of daily living]." (R. 818–19, ECF No. 49-3 at 244–45.) Similarly, Dr. Brezausek completed a "Behavioral Functional Evaluation Form" indicating that Miller had "Minimal Ability" to perform a broad range of activities and had "no ability" to "[p]erform[ ] a variety of duties" or be "[r]eliab[le] / consisten[t]." (R. 2297, ECF No. 49-9 at 84.) Dr. Brezausek noted that "stress involves [Miller's] depression, suicidal ideations, ability to make decisions / finding directions," and cited family-related stress. (*Id.*)

But these extreme restrictions and limitations had no support in Dr. Brezausek's objective findings. Dr. Brezausek's "Current Mental Status Examination," based on her June 30, 2014, examination of Miller, again indicated that Miller was well-groomed and cooperative and that Miller's speech was normal, her thought process was "Logical/Coherent," her insight into her illness was good, and her attention and memory were intact. (R. 2295, ECF No. 49-9 at 82.) Consistent with her statement

the month prior, Dr. Brezausek described Miller's psychomotor activity as "Retardation," with a handwritten notation "slow to answer," and indicated Miller's concentration was "impaired: mild." (*Id.*)

On August 6, 2014, Hartford propounded specific questions to Dr. Brezausek relating to these inconsistencies. (R. 338–39, ECF No. 49-2 at 51–52.) Dr. Brezausek responded as follows:



Your 5/28/14 and 6/30/14 treatment notes indicate normal mental health exam findings. You note objective findings of your patient's tearfulness, psychomotor retardation, fatigue and mild concentration impairment on the APS dated 7/10/14 (6/30/14 exam date.) Please explain the different exam findings from the same office visit: *I did not detail a psychiatric exam in my notes, & for that I apologize.*

Your patient has not followed up with your treatment recommendations for psychiatry and therapy. Please indicate how her non-compliance is being addressed: *I believe she has an upcoming appointment.*

Your patient's estimated return to work date has been extended to 8/15/14, but you note your patient may have a lifetime of limitations. She is not in behavioral health treatment and there have been no medication changes. Please indicate the plans in place to improve her level of psychological functioning: *She has an upcoming psychiatric appointment.*

There is no evidence that Miller visited a mental health care provider of any kind until after Hartford terminated Miller's benefits ten months later.

Hartford conditionally approved Miller's application for long-term disability benefits on August 14, 2014. (R. 196–97, ECF No. 49-1 at 197–98.)

### E. *Social Security Administration's initial denial of Miller's claim*

Once Miller began receiving long-term disability benefits, she applied for Social Security disability insurance benefits, as required by the Plan (R. 194, ECF No. 49-1

at 195), claiming disability due to fibromyalgia, depression, chronic fatigue, and psoriatic arthritis, (R. 1139–39, ECF No. 49-5 at 9–11).

On September 25, 2014, in connection with her application, Miller and her husband each submitted a "Function Report." These function reports give the overall impression that Miller was bedridden due to pain and fatigue and, due to concentration problems, unable to handle money, carry on a conversation, or even follow plots on television. (*See* R. 1195–1210, ECF No. 49-5 at 67–82.)

On November 3, 2014, psychologist Albert H. Fink, Ph.D., conducted a Mental Status Evaluation of Miller on behalf of the Disability Determination Bureau of the Family & Social Services Administration. Miller reported to Fink that she "has no difficulty with personal care, although everything she does takes more time than in the past because of her physical condition. She will perform basic household tasks such as cleaning, laundry, cooking." (R. 1378, ECF No. 49-5 at 250.) "She reports no difficulty dealing with finances." (*Id.*) Fink concluded that "[w]ith respect to work-related activities, the claimant's cognitive abilities are adequate for a variety of unskilled or semi-skilled vocational tasks" and that she "should be able to deal effectively with the social requirements of typical work environments if they are moderate in their intensity and frequency." (R. 1379, ECF No. 49-5 at 251.)

The next day, Thomas Sonne, M.D., examined Miller in connection with her application. (R. 1385, ECF No. 49-5 at 257.) Miller reported to Dr. Sonne that she "does not cook, clean, shop but does drive with help." (R. 1380, ECF No. 49-5 at 252.) Miller further reported that "she can walk without having to sit for about a block," that she

"can stand without having to sit for about 5 minutes," and that she can "sit without having to move for about 5 minutes." (R. 1380, ECF No. 49-5 at 252.) Despite Miller's self-reported limitations, Dr. Sonne observed that Miller had "[n]ormal posture and gait," had "the ability to ambulate about the room at a normal pace without holding on to the wall," and had "no difficulty getting on/off the examination table." (R. 1381, ECF No. 49-5 at 253.) Dr. Sonne further observed that Miller had "normal grip strength, normal gait and station and normal muscle strength." (R. 1382, ECF No. 49-5 at 254.) Dr. Sonne concluded based on his physical examination that Miller "has the ability to perform activities involving sitting, standing, moving about, lifting, carrying, handling objects with both hands . . . kneeling/squatting, hearing, and speaking," and that Miller "could do [a] job [for which] she did not have to walk very far or do much lifting." (R. 1382, ECF No. 49-5 at 254.)

Soon thereafter, on November 10, 2014, M. Brill, M.D., conducted a Physical Residual Functional Capacity Assessment of Miller on behalf of the Disability Determination Bureau. (R. 1389–91, ECF No. 49-5 at 261–63.) Dr. Brill found that Miller could "occasionally" lift or carry 20 pounds, could "frequently" lift or carry 10 pounds, could stand or walk for a total of about six hours in an eight-hour workday, could sit with normal breaks for about six hours in an eight-hour workday, and had no manipulative limitations. (R. 1390, ECF No. 49-5 at 262.) That same day, the Disability Determination Bureau determined that Miller was not disabled, (R. 1392, ECF No. 49-5 at 264), and the Social Security Administration ("SSA") denied Miller's claim. (R. 1211–15, ECF No. 49-5 at 83–87.)

Miller requested reconsideration of the SSA's decision on November 20, 2014. (R. 1247, ECF No. 49-5 at 119.) J. Sands, M.D., completed a Physical Residual Functional Capacity Assessment, determining that Miller was capable of light work, (R. 1415–17, ECF No. 49-6 at 8–10), and on January 28, 2015, the SSA upheld its initial determination. (R. 1233, ECF No. 49-5 at 105.) Miller promptly requested a hearing before an administrative law judge. (R. 1248, ECF No. 49-5 at 1248.)

### F. Hartford's termination of Miller's long-term disability benefits

On February 24, 2015, Dr. Brezausek submitted a "Physical Capacities Evaluation Form" to Hartford indicating that Miller could sit up to eight hours per day; that she could "lift/carry/push/pull" one to ten pounds "frequently" and 11 to 20 pounds "occasionally"; that she could drive, climb, balance, stoop, kneel, crouch, crawl, and reach "occasionally"; and that she could handle and finger with both hands "frequently," though she "needs to avoid frequent repetitive motions due to her fibromyalgia." (R. 674–75, ECF No. 49-3 at 100–101.)

On March 13, 2015, Hartford addressed several questions to Dr. Brezausek seeking clarification of that evaluation. (R. 668, ECF No. 49-3 at 94.) Dr. Brezausek responded on March 27, 2015, indicating that she "believe[d]" that Miller could frequently reach at waist/desk level and that Miller could not handle and finger frequently because "she has osteoarthritis in her hands." (R. 668, ECF No. 49-3 at 94.) She added that Miller was functionally impaired due to depression and that Miller's psychiatric symptoms "can be incapacitating." (R. 669, ECF No. 49-3 at 95.) Finally, Dr. Brezausek, in response to Hartford's query about referral to a psychiatrist or

therapist, wrote, "am considering this." (*Id.*) (Despite Miller's and Dr. Brezausek's reports that Miller was effectively bedridden due to her fibromyalgia, psoriatic arthritis, and mental/emotional impairments, Miller did not seek treatment from a psychiatrist or rheumatologist for over a year after her date of disability.)

Hartford referred Miller's file for review by a rheumatologist and a psychiatrist, notifying Miller on April 9, 2015. (R. 113–17, ECF No. 49-1 at 114–18.) In office visit notes from April 13, 2015, Dr. Brezausek reported that Miller "presents today for Hartford called her, and she needs to discuss things with me about her insurance . . . . Emesis and not sleeping [for] 4 days. Worked [for] 40 years. Didn't just wake up and decide to be sick." (R. 452, ECF No. 49-2 at 165.) Dr. Brezausek found that Miller was "[a]lert, cooperative," and in "no distress," that Miller was "tender in points on back consistent with fibromyalgia," and that Miller's extremities and neurologic exam were normal. (R. 452, ECF No. 49-2 at 165.) While noting in the subjective section that Miller "states her hands are swollen," Dr. Brezausek reported in the physical exam portion, "Extremities normal, atraumatic, no cyanosis or edema." (R. 452, ECF No. 49-2 at 165.)

Hartford enlisted Dr. Marcus Goldman and Dr. Ibrahmin Alghafeer to review Miller's medical records. (R. 180, ECF No. 49-1 at 181.) Dr. Goldman, a board-certified psychiatrist, noted that, despite Dr. Brezausek's primary diagnosis of depression, Miller did not undergo dedicated mental health treatment, Miller's medical records contained no recent mental status examinations, Miller's pharmacotherapy had been

static, and Dr. Brezausek confirmed that Miller had no cognitive dysfunction. (R. 654, ECF No. 49-3 at 80.)

Dr. Alghafeer, a board-certified rheumatologist, noted that, despite Dr. Brezausek's opinion that, due to pain and fatigue, Miller was unable to work—or even move, as Dr. Brezausek's initial Physical Capacities Evaluation indicated that Miller was effectively bedridden—Dr. Brezausek's examinations did not identify any "physical findings of de-conditioning (orthostatic hypotension, resting tachycardia, desaturation, muscle wasting) as a result of her fatigue." (R. 657, ECF No. 49-3 at 83.) Although Dr. Alghafeer found that Miller's subjective complaints of pain "were supported in the medicals," he noted that "evidence[-]based medicine supports exercise and cardiovascular fitness training as part of fibromyalgia therapy," and that "prolonged lack of exercise exacerbates physical weakness and adherence to a graded exercise therapy alone can be beneficial." (R. 657, ECF No. 49-3 at 83.) Dr. Alghafeer concluded that "[f]rom a rheumatology standpoint, restrictions are not supported." (R. 657, ECF No. 49-3 at 83.)

Relying on Dr. Alghafeer's and Dr. Goldman's reports, as well as Miller's medical records, Hartford terminated Miller's long-term disability benefits on May 7, 2015, finding that Miller did not continue to meet the Plan's definition of "Disability" beyond May 6, 2015. (R. 177, ECF No. 49-1 at 178.)

Miller visited a rheumatologist—apparently for the first time since 2013—on August 18, 2015. Dr. Richard E. Bell did "not detect synovitis or significant limitation and [sic] fingers, wrists, elbows, shoulders, knees, ankles, feet." Dr. Bell did, however,

note "tenderness over lumbar spine," as well as pain in the hips "with full flexion and internal rotation," and "tenderness in of all 18 fibromyalgia" trigger points. (R. 2400, ECF No. 49-9 at 187.) Dr. Bell ordered x-rays, and in a radiology report for Miller's hands, Dr. Bell reported that he "d[id] not see radiographic evidence of psoriatic arthritis," and found "mild joint space loss of the DIP joints. No characteristic erosive changes or productive changes of psoriasis. Normal bone mineralization. Normal soft tissues." (R. 508, ECF No. 49-2 at 221.) Dr. Bell also ordered x-rays of Miller's hips and found that "[t]he sacroiliac and hip joints with [sic] good," and "[t]here are no acute bony, joint or soft tissue abnormalities." (R. 510, ECF No. 49-2 at 223.)

Two days later, Dr. Brezausek submitted to Hartford a Treating Physician's Statement. (R. 2829–31, ECF No. 49-10 at 307–309.) Dr. Brezausek's statement indicated that Miller could work zero hours per day; stand for only 15 minutes at a time and for less than 60 minutes in a workday; sit for only 15 minutes at a time and for 60 minutes in a workday; occasionally lift five pounds and lift no weight frequently; bend occasionally; and stoop never. (*Id.*) Dr. Brezausek opined that Miller was currently disabled from performing her occupation or the material duties of any occupation. (*Id.*) Dr. Brezausek attributed these restrictions to, *inter alia*, "difficulty concentrating," "problems with memory," and "arthritis affect[ing] her hands and fingers." (*Id.*) Miller's prognosis, according to Dr. Brezausek, was "fair to poor." (*Id.*) Dr. Brezausek added that Miller "is not malingering." (*Id.*)

Dr. Brezausek's conclusions about Miller's problems with concentration and memory did not cite any testing or mental status examination. But Miller had begun

visiting a licensed clinical social worker on May 22, 2015, and Miller's mental status examination indicated that she was "well groomed" and "cooperative," that her behavior was "appropriate," her mood was "appropriate and broad," her thought content was "appropriate and unremarkable," her thought process was "logical, sequential and relevant," and her cognition was "oriented, adequate memory, no noticeable cognitive deficits, adequate judgment." (R. 1825, 1829, ECF No. 49-7 at 178, 182.) In her regular visits—which are documented through August 2016—Miller was consistently found to be "attentive and cooperative" or "moderately attentive and moderately cooperative," with no other objective findings about her mental status. (R. 1832–58, ECF No. 49-7 at 185–211.) The only mention of memory problems was on February 24, 2016, when Miller reported memory loss that she felt "might be associated with opiate use." (R. 1849, ECF No. 49-7 at 202.)

### G. *Miller's administrative appeal of Hartford's decision*

Miller appealed Hartford's decision by letter dated October 28, 2015. Hartford enlisted board-certified rheumatologist Dr. Brian Peck and board-certified psychiatrist Dr. Maureen Smith Ruffell to review Miller's medical records. (R. 161, ECF No. 49-1 at 162.)

Dr. Ruffell noted that Dr. Brezausek "confirmed [Ruffell's] impression from reading the written materials that [Miller] does not suffer from any severe symptoms of mental illness," and that Dr. Brezausek reported that when she speaks with Miller "everything makes sense." (R. 57, ECF No. 49-1 at 58.) Dr. Ruffell also noted Dr.

Brezausek's unconvincing explanation—referencing scheduling problems—for Miller's failure to seek any psychological treatment despite Miller's and Dr. Brezausek's reports of incapacitating mental health problems. (R. 58, ECF No. 49-1 at 59.) Dr. Ruffell noted that Dr. Brezausek cited no objective evidence of poor concentration, instead relying solely on Miller's self-reported symptoms. (R. 58, ECF No. 49-1 at 59.) Dr. Ruffell further observed that although Dr. Brezausek opined that Miller "would get confused, lost or misinterpret things" if she attempted to work even three hours a day, Dr. Brezausek did not restrict Miller from driving a car, "an activity that would be quite risky for anyone prone to getting confused, lost or likely to misinterpret things." (R. 61, ECF No. 49-1 at 62.) Ultimately, Dr. Ruffell concluded that there was "inadequate support for the claim of mental/emotional symptoms so severe that they would be likely to preclude the claimant's ability to function in the workplace despite them," especially as "productive activity is generally considered a useful and necessary component of treatment for most mental/emotional conditions." (R. 61–62, ECF No. 49-1 at 62–63.)

Dr. Peck noted that Dr. Bell, Miller's treating rheumatologist, had seen Miller only once and though he agreed with the diagnoses of psoriasis and fibromyalgia, he was "unable to document the presence of [psoriatic arthritis] and found no evidence of synovitis." (R. 68, ECF No. 49-1 at 69.) Dr. Peck also noted that Dr. Bell found "evidence of mild osteoarthritis in the lumbar spine." (*Id.*) Dr. Peck concluded that Miller "is capable of performing light work as defined in the DOL-DOT on a full time basis," and that the "reasons for limiting [Miller] to light work are her chronic pain

and decreased [range of motion] due to lumbar spondylosis, [fibromyalgia], and [osteoarthritis] of the hands and feet." (R. 70, ECF No. 49-1 at 71.)

On December 17, 2015, Hartford upheld its initial decision to terminate Miller's benefits. (R. 161, ECF No. 49-1 at 162.)

Miller visited Dr. Bell again on December 8, 2015. (R. 2403, ECF No. 49-9 at 190.) Dr. Bell again "d[id] not detect synovitis of the hands, wrists, elbows, knees, ankles." (*Id.*) Nor did he "detect psoriatic damage in the joints." (*Id.*) And again, on March 22, 2016, Dr. Bell "d[id] not detect synovitis of hands, wrists, elbows, knees, ankles." (R. 2406, ECF No. 49-9 at 193.)

On March 28, 2016, Miller visited bariatric surgeon Dr. Steven Clark for evaluation for revisional bariatric surgery. (R. 1928, ECF No. 49-8 at 2.) Dr. Clark found that Miller was "alert, cooperative, no distress," that her back had normal range of motion, and that her extremities were "normal, atraumatic, no cyanosis or edema." (R.1930, ECF No. 49-8 at 4.) Miller returned to the bariatric surgeon's office on April 20, 2016, and initiated the six-month process required for revision surgery, which process includes psychologist and dietician visits. (R. 1934–36, ECF No. 49-8 at 6–8.)

On May 10, 2016, Miller visited a registered dietician at the bariatric surgeon's office. (R. 1934, ECF No. 49-8 at 8.) Miller reported that she does the grocery shopping and cooking for her household, except that her husband grills, and that she eats out twice per week. (R. 1935, ECF No. 49-8 at 9.) Miller further reported that she exercised in the pool for one hour, two to three times per week; she biked one hour

daily; she took 10,000 to 11,000 steps per day; and she planned to begin resistance training two times per week. (R. 1935, ECF No. 49-8 at 9.) The following month, Miller reported that she had added resistance training three times per week. (R. 1936, ECF No. 49-8 at 10.) By the following month, she had increased her walking to more than 13,000 steps per day while maintaining her other exercises. (R. 1938, ECF No. 49-8 at 12.) Miller's exercise routine ebbed somewhat (as low as 8,000 to 9,000 steps per day) in August and September (R. 1939, 1942–47, ECF No. 49-8 at 14, 16–21), but her activity level returned to its previous heights by early October, (R. 1948, ECF No. 49-8 at 22).

## H. Miller's SSA hearing

In the course of this intensive exercise regimen, on September 29, 2016, Miller attended her SSA hearing before an administrative law judge. (R. 1116, ECF No. 49-4 at 270.) In advance of the hearing, Dr. Brezausek submitted a letter that concluded:

Mrs. Miller has deteriorated to the point that she cannot perform most activities of daily living. She has difficulty concentrating, has problems with her memory, and has difficulty organizing tasks due to her fatigue, pain, and sleep deprivation. She can only sit or stand at one time for usually less than 15 minutes, but she can only perform these activities for less than 60 minutes during a work day. She has difficulty grasping, reaching lifting, twisting and bending. She can lift less than 5 pounds on an occasional basis, and cannot stoop or crouch. She has difficulty turning her neck, and arthritis affects her hands and fingers. Her medications cause nausea, headaches, drowsiness, and periodic diarrhea. The chronic pain and fatigue make her very undependable. If she does have a good day and leaves her home, it usually takes her 2 - 3 days to recover her energy level to where she can even do small tasks like getting out of bed or taking a bath. I believe she cannot work an 8 hour day on any consistent or reliable basis without frequent interruptions, rest breaks, and/or absences due to her condition. The prognosis for her recovery is poor since her symptoms have been persistent for the pat 3 - 4 years.

(R. 1907, ECF No. 49-7 at 260.) Dr. Brezausek also submitted a Fibromyalgia Residual Functional Capacity Questionnaire indicating that Miller cannot walk even a single city block without rest or severe pain, (R. 1910, ECF No. 49-7 at 263), that her

other diagnoses include, inter alia, "psoriatic arthritis and osteoarthritis," and that she has "difficulty with concentration and memory." (R. 1912, ECF No. 49-7 at 265.)

At the hearing, Miller "testified that she could sit for less than thirty minutes and walk to the mailbox," and that "she spends most of the day sleeping and does not perform household chores due to her conditions." (R. 1120, ECF No. 49-4 at 274.) Statements to similar effect were submitted by Miller's husband and son, as well as a former co-worker and Miller's hired help. (R. 1123–24, ECF No. 49-4 at 277–78.)

The ALJ concluded that Miller "has the residual capacity to perform sedentary work . . . except that [Miller] can occasionally climb ladders, ropes, scaffolds, ramps and stairs, and can occasionally balance, stoop, kneel, crouch, and crawl." (R. 1119, ECF No. 49-4 at 273.) The ALJ further found that Miller "can understand and re- member simple instructions and carry out simple, routine tasks that require little independent judgment or decision making at an average production rate pace, but should not perform tasks with stringent speed or strict rate based production require- ments and involving few if any daily changes in a work task or work environment. [Miller] can have occasional interaction with the public and frequent interaction with coworkers and supervisors." (R. 1119, ECF No. 49-4 at 273.) The ALJ assigned Dr. Brezausek's opinion that Miller could not perform any occupation "limited weight as it is too restrictive." (R. 1122, ECF No. 49-4 at 276.) In his decision, issued January 13, 2017, the ALJ concluded that Miller could not perform any past relevant work because that work was semiskilled while Miller's residual capacity is unskilled; that Miller "was an individual closely approaching advanced age" on her date of disability;

and that Miller therefore "has been under a disability as defined in the Social Security Act since March 15, 2014." (R. 1124–25, ECF No. 49-4 at 278–79.)

## I. *The instant suit and remand*

Miller filed suit on January 20, 2016, alleging that she became disabled in March 2014 due to fibromyalgia, psoriatic arthritis, sleep apnea, chronic fatigue syndrome, osteoarthritis, and chronic pain, and that Hartford wrongfully terminated her long-term disability benefits. (Compl. ¶ 10, ECF No. 1 at 2.) While this case was pending, Hartford discovered that two pages of Dr. Brezausek's August 2015 Treating Physician's Statement, discussed above at page 16, were not contained in the administrative record and had not been considered in evaluating Miller's administrative appeal. (ECF No. 25 at 2.) Hartford moved for remand to consider the two pages, which motion Miller opposed. (ECF Nos. 25, 27.) This court granted the motion and remanded the case on May 19, 2017. (ECF No. 34.)

## J. *Hartford's decision on remand*

On remand, the administrative record was supplemented with updated medical records from Miller's treating physicians—Dr. Brezausek and Dr. Bell, as well as her bariatric surgeon—and Miller's file from the SSA.

On May 25, 2017, Dr. Brezausek submitted an Attending Physician Statement, indicating that Miller's diagnoses are "fibromyalgia, psoriatic arthritis, depression, panic attacks, sleep apnea, chronic fatigue syndrome, osteoarthritis, and chronic pain." (R. 2131, ECF No. 49-8 at 205.) Dr. Brezausek opined that Miller was currently disabled from performing the material duties of her occupation or, indeed, any

occupation.  (R. 2132, ECF No. 49-8 at 206.)  Dr. Brezausek indicated that Miller could work for zero hours per day; stand for only 15 minutes at a time and less than 60 minutes total in a workday; sit for only 15 minutes at a time and 60 minutes total in a workday; lift 5 pounds occasionally and lift no weight frequently; bend occasionally; and stoop never.  (R. 2132, ECF No. 49-8 at 206.)  In explaining why Miller could not perform the duties of any occupation, Dr. Brezausek wrote:

> She has difficulty concentrating. Depression & Anxiety levels prevent her from performing tasks correctly and impacts all of her interactions. She can only stand for short periods of time. Her arthritis affects her hands & fingers. She cannot bend or lift. Chronic pain & fatigue make her undependable. She has a hard time turning her neck. She has difficulty any job for very long. She has problems w/memory & difficulty organizing tasks. Medications cause nausea. She has difficulty following directions due to her fatigue, pain & arthritis.

(R. 2132, ECF No. 49-8 at 206.)

The record on remand also included additional office visit notes from Dr. Bell.  As noted above, on March 22, 2016, Dr. Bell "d[id] not detect synovitis of hands, wrists, elbows, knees, ankles."  (R. 2406, ECF No. 49-9 at 193.)  On July 20, 2016, Dr. Bell did note tenderness and swelling in Miller's right hand but "d[id] not detect other synovial thickening in the hands, wrists, elbows, knees, ankles, feet."  (R. 2408, ECF No. 49-9 at 195.)  On January 16, 2017, Dr. Bell found that Miller "exhibit[ed] decreased range of motion (90 percent fist)" in both hands but "exhibit[ed] no swelling." (R. 2411, ECF No. 49-9 at 198.)  He "d[id] not detect synovitis of the hands, wrists, elbows, knees, ankles."  (*Id.*)  With respect to Miller's reported chronic lower back pain, Dr. Bell reported that Miller "d[id] not want to pursue further evaluation of possible sacroiliitis at this time.  She is not interested in the biologic treatments now." (*Id.*)

To review Miller's medical records on remand, Hartford enlisted Dr. Benjamin Kretzmann, a board-certified rheumatologist, and Dr. Joshua Lewis, board certified in internal medicine. Dr. Kretzmann found that Dr. Brezausek's restrictions "are based on the claimant's self[-]reported deficits of function, which are not supported by the objective evidence." (R. 2056, ECF No. 49-8 at 130.) He "gave little weight to the claimant's SSDI decision, as this decision was based upon factors other than the claimant's rheumatologic condition and screening exams reflective of a Light and Sedentary work activity." (*Id.*) He continued, "Dr. Brezausek has opined the claimant is totally restricted based on a combination of mental health and physical symptoms self reported symptoms [sic]. Concurrently, the claimant and Dr. Brezausek report job instability and family stress issues. Specifically, it should be noted that Dr. Brezausek asked the claimant to be warned her job was in jeopardy, indicating a personal/professional relationship between herself and the claimant." (R. 2058, ECF No. 49-8 at 132.) Dr. Kretzmann concluded that "[Miller] is mildly functionally limited due to deficits of strength in her lower extremities, primarily due to body habitus in the setting of mild hand degenerative changes with moderate to advanced lumbar facet arthropathy. There is no evidence to support total work activity restriction due to Fibromyalgia, as the treatment for this condition includes normal, scheduled activity with the avoidance of narcotics for pain management." (R. 2058, ECF No. 49-8 at 132.)

Dr. Lewis found that "[w]hile [Miller] does have subjective complaints of chronic pain in her muscles, fatigue, anxiety attacks, stiff joints (hands, legs, back), psoriasis, depression, anxiety, and memory problems, there is no documentation of objective functional deficits that would support the restriction of 'no work.'" (R. 2064, ECF No. 49-8 at 138.) He further found that "while [Miller] does have reported concentration issues, there is no documentation of mental status examinations identifying objective findings to support any restrictions/limitations." (*Id.*) As to Miller's ability to sit, stand, and walk, Dr. Lewis concluded that "there are no objective functional deficits regarding the lumbar spine or bilateral lower extremities," so "there are no supported restrictions/limitations[.]" (R. 2064–65, ECF No. 49-8 at 138–39.) As for Miller's ability to finger, feel, type, etc., Dr. Lewis concluded that "there is normal range of motion without swelling in the bilateral hands" and "no synovitis or significant limitation at the fingers, wrists, elbows, and shoulders," so "there are no supported restrictions/limitations[.]" (R. 2065, ECF No. 49-8 at 139.)

Relying on Dr. Kretzmann's and Dr. Lewis's reports, Hartford denied Miller's claim on remand on August 1, 2017. (R. 997, ECF No. 49-4 at 151–160.) Miller alleges that Hartford wrongfully terminated her long-term disability benefits and seeks to recover those benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). (Compl. ¶¶ 1, 17–20, ECF No. 1 at 1, 3.) Both sides now move for summary judgment.

## II. Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Where, as here, the parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita*, 475 U.S. at 587.

This ERISA case challenging a denial of benefits under § 1132(a)(1)(B) is subject to the arbitrary and capricious—*i.e.*, abuse of discretion—standard of review because the Plan grants discretionary authority to Hartford to determine eligibility for benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Black v. Long Term Disability Ins.*, 582 F.3d 738, 743–44 (7th Cir. 2009). "The arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Id.* (quoting *Trombetta v. Cragin Fed. Bank for Savings Emp. Stock Ownership Plan*, 102

F.3d 1435, 1438 (7th Cir. 1996)). The administrator's decision "may not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for that decision." *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006). Though highly deferential, the arbitrary and capricious standard "is not a rubber stamp," and the administrator's decision will not be upheld in the "absence of reasoning in the record to support it." *Hackett v. Xerox Corp. Long-Term Disability Income*, 315 F.3d 771, 773 (7th Cir. 2003).

Here Miller bears the "substantive evidentiary burden," *Anderson*, 477 U.S. at 254, of proving her entitlement to benefits under the Plan, *see Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005) (holding that an employee seeking to enforce benefits bears the burden of proving entitlement to those benefits). Thus, summary judgment for Hartford is warranted if, viewed in the light most favorable to Plaintiff, "the record as a whole could not lead a rational trier of fact" to find that Hartford abused its discretion by terminating Miller's benefits. *See Matsushita*, 475 U.S. at 587; *Semien*, 436 F.3d at 812.

## III. Discussion

Miller contends that Hartford's decision to terminate her long-term disability benefits was arbitrary and capricious for myriad reasons, none of them meritorious.

### A. *Reliability of Dr. Brezausek's opinions*

The central issue is the reliability of the opinions of Dr. Brezausek, Miller's primary care physician. Miller contends that Hartford abused its discretion by giving

more weight to its record-reviewing physicians than to Dr. Brezausek. "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 774–75 (7th Cir. 2010).

In *Holmstrom*, there was no evidence in the record to provide a reasonable basis for disagreeing with the treating physician, as every doctor who had examined the plaintiff concluded that she was disabled. 615 F.3d at 775. Here, by contrast, the administrative record contains ample evidence from which Hartford and its reviewing physicians could reasonably deem Dr. Brezausek's opinions unreliable. "Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits[.]" *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). Hartford could reasonably conclude that Dr. Brezausek acted "more as an advocate than a doctor rendering objective opinions," *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006), from (1) inconsistencies between Dr. Brezausek's own opinions, and between her opinions and her own findings and course of treatment, (2) other physicians' findings and opinions contradicting Dr. Brezausek's,

(3) evidence of Miller's activity far exceeding Dr. Brezausek's restrictions and limitations, and (4) evidence of a personal relationship—beyond doctor-patient—between Dr. Brezausek and Miller.

First, Dr. Brezausek's opinions were inconsistent. Dr. Brezausek's February 2015 Physical Capacities Evaluation indicated that Miller could sit for up to eight hours per day; that she could "lift/carry/push/pull" one to ten pounds "frequently" and 11 to 20 pounds "occasionally"; that she could drive, climb, balance, stoop, kneel, crouch, crawl, and reach "occasionally"; and that she could handle and finger with both hands "frequently," though she "needs to avoid frequent repetitive motions due to her fibromyalgia." (R. 674–75, ECF No. 49-3 at 100–101.) But Dr. Brezausek's opinion changed drastically after Hartford terminated Miller's benefits. In August 2015, Dr. Brezausek submitted an Attending Physician's Statement indicating that Miller could work for zero hours per day; stand for only 15 minutes at a time and for less than 60 minutes in a workday; occasionally lift five pounds and lift no weight frequently; bend occasionally; and stoop never. (R. 2829–31, ECF No. 49-10 at 307–309.) There is no explanation in the record for Miller's apparent sudden decline.

Even setting aside the February 2015 Physical Capacity Evaluation, Dr. Brezausek's prescribed restrictions and limitations were inconsistent with her own objective findings (where she made any) and courses of treatment. Dr. Brezausek opined that Miller had such significant problems with concentration and memory, and was so prone to confusion, that she was unable to perform basic activities of daily

living.[3] But Dr. Brezausek's mental status examinations—on the rare occasions she conducted any—found that Miller was well-groomed and cooperative; that Miller's speech was normal, her thought process was "Logical/Coherent," her insight into her illness was good, her psychomotor activity was within normal limits except (depending on the examination) with "some agitation" or "slow to answer," her attention and memory were intact, and her concentration (depending on the examination) was intact or "impaired: mild." (*See* R. 2290, 2292, 2295.) (There is no record evidence that Dr. Brezausek tested Miller's concentration or memory.) Indeed, Dr. Brezausek confirmed to Hartford's record-reviewing psychiatrists that Miller had no cognitive dysfunction (R. 654, ECF No. 49-3 at 80), that she did "not suffer from any severe symptoms of mental illness," (R. 57, ECF No. 49-1 at 58), and that when Dr. Brezausek spoke with Miller, "everything ma[de] sense" (*id.*).

Similarly, Dr. Brezausek indicated that Miller could sit for no more than two hours per day and stand and walk for less than one hour per day. (R. 2293, ECF No. 49-9 at 80.) Miller, in Dr. Brezausek's view, was confined to bed for more than 21 hours per day. But, as Dr. Alghafeer noted, Dr. Brezausek's examinations were in-

---

[3] Although Miller does not pursue a claim for mental-illness disability here, Dr. Brezausek continued to rely on mental illness for her evaluations of Miller's functional capacity on remand. In her May 25, 2017, Attending Physician Statement, Dr. Brezausek opined that Miller could not perform the duties of any occupation because "she has difficulty concentrating" and "depression and anxiety levels prevent her from performing tasks correctly and impacts all of her interactions." (R. 2132, ECF No. 49-8 at 206.) Hartford was entitled to consider Dr. Brezausek's problematic mental-illness findings and opinions, among other things, in deciding to discredit all of Dr. Brezausek's findings and opinions.

consistent with such complete lack of activity: Dr. Brezausek made no "physical findings of de-conditioning (orthostatic hypotension, resting tachycardia, desaturation, muscle wasting)[.]" (R. 657, ECF No. 49-3 at 83.)

Moreover, despite finding such severe, debilitating psychological impairments as to prevent Miller from performing activities of daily living or working even a single hour in any occupation, as Miller "would get confused, lost, or misinterpret things," Dr. Brezausek never restricted Miller from driving a car. Nor did Dr. Brezausek refer Miller to a mental health care provider of any kind—until Hartford terminated Miller's benefits. Likewise, despite finding extreme functional limitations due to Miller's fibromyalgia, psoriatic arthritis, and osteoarthritis, Dr. Brezausek did not refer Miller to a rheumatologist—until Hartford terminated Miller's benefits.

Second, when Miller finally visited those specialists, their findings contradicted Dr. Brezausek's. The licensed clinical social worker found Miller's behavior was "appropriate," her mood was "appropriate and broad," her thought content was "appropriate and unremarkable," her thought process was "logical, sequential and relevant," and her cognition was "oriented, adequate memory, no noticeable cognitive deficits, adequate judgment." (R. 1829, ECF No. 49-7 at 182.) Over regular visits for more than a year, the only indication in the office visit notes of any differing findings were two instances where Miller was merely "moderately attentive and moderately cooperative," and one instance where Miller reported memory loss that Miller felt "might be associated with opiate use." (R. 1832–58, ECF No. 49-7 at 185–211.) Similarly, despite Dr. Brezausek's repeated findings of limitations based on Miller's psoriatic

arthritis and osteoarthritis, Dr. Bell found no "radiographic evidence of psoriatic ar-
thritis," consistently found no "synovitis or significant limitation [of] fingers, wrists,
elbows, shoulders, knees, ankles feet," (R. 2400, ECF No. 49-9 at 187), and found only
"mild joint space loss of the DIP joints," as well as "[n]ormal bone mineralization" and
"[n]ormal soft tissues," (R. 508, ECF No. 49-2 at 221.) (Dr. Bell did once note tender-
ness and swelling of the right hand, R. 2408, and once noted decreased range of mo-
tion, 90 percent fist, but no swelling, R. 2411.) Although Dr. Bell noted pain in Mil-
ler's hips "with full flexion and internal rotation," he found from x-rays that the "sa-
croiliac and hip joints" were "good," with "no acute bony, joint or soft tissue anoma-
lies." (R. 510, ECF No. 49-2 at 223.)

These findings by Miller's rheumatologist and licensed clinical social worker were
squarely at odds with Dr. Brezausek's findings and opinions, but they were fully con-
sistent with the findings and opinions of the SSA's examining psychologist and ex-
amining physician, both of whom found Miller capable of light work. Dr. Fink found
that Miller's speech was "logical and sequential, with no evidence of unusual thought
processes," that Miller's "[i]mmediate, recent and remote memory were intact," and
that Miller was "alert and fully oriented and in command of basic information facts."
(R. 1377–78, ECF No. 49-5 at 249–50.) Dr. Sonne found that, despite Miller's ex-
treme, self-reported limitations, Miller had "[n]ormal posture and gait," had "the abil-
ity to ambulate about the room at a normal pace without holding on to the wall," had
"no difficulty getting on/off the examination table," and had "normal grip strength,

normal gait and station and normal muscle strength." (R. 1381–82, ECF No. 49-5 at 253–54.)

The foregoing would more than justify Hartford's discounting of Dr. Brezausek's opinions. Dr. Brezausek's opinions lacked supporting, objective findings and were contradicted by the examining specialists, not to mention by some of her own opinions and course of treatment; yet through 2017, Dr. Brezausek insisted that Miller had extreme restrictions and limitations based—at least in part—on mental illness and arthritis, offering neither explanation for the disagreement nor alternative objective findings. (*See, e.g.*, R.2132, ECF No. 49-8 at 206.) But there's more.

Third, Dr. Brezausek's restrictions and limitations were contradicted by evidence of Miller's actual activity. Dr. Brezausek found that Miller could barely perform her activities of daily living, but Miller reported to Dr. Fink in November 2014 that she "has no difficulty with personal care, although everything she does takes more time than in the past because of her physical condition. She will perform basic household tasks such as cleaning, laundry, cooking." (R. 1378, ECF No. 49-5 at 250.) Likewise, Miller told her dietician in May 2016 that she does the grocery shopping and cooking for her household. (R. 1935, ECF No. 49-8 at 9.)

Dr. Brezausek submitted a letter to the SSA in August 2016 stating that Miller "has deteriorated to the point that she cannot perform most activities of daily living"; "can only sit or stand . . . for less than 60 minutes during a work day"; and can "lift less than 5 pounds on an occasional basis." Dr. Brezausek added, "[i]f she does have a good day and leaves her home, it usually takes her 2-3 days to recover her energy

level to where she can even do small tasks like getting out of bed or taking a bath." (R. 1907, ECF No. 49-7 at 260.)  But over the course of six months, including August 2016, Miller exercised in the pool for one hour, two to three times per week; she biked for one hour daily; she walked between 8,000 and 13,000 steps each day; and she engaged in resistance training three times per week.

Fourth, Hartford had evidence, direct and indirect, that Dr. Brezausek and Miller had a personal relationship beyond formal doctor-patient and that Dr. Brezausek was acting "more as an advocate."  In June 2014, Dr. Brezausek sent a message to a colleague stating, "Darn it.  [Miller] is positive for Chronic Fatigue Immunodeficiency Syndrome (CFIDS)," and asking the colleague to "[l]et [Miller] know that I will fill out her Hartford paperwork, but that we have heard through the grapevine that she may have her job in jeopardy."  (R. 897, ECF No. 49-4 at 51.)  Dr. Brezausek submitted an essentially normal Physical Capacities Evaluation in February 2015.  But in August 2015, after Hartford terminated Miller's benefits, Dr. Brezausek submitted a Treating Physician's Statement indicating that Miller could work zero hours per day and was effectively bedridden.  Similarly, despite reporting debilitating rheumatological and psychological impairments, Dr. Brezausek did not refer Miller for mental health treatment or to a rheumatologist until after Hartford terminated benefits.

It was eminently reasonable for Hartford to discredit Dr. Brezausek's opinions; Dr. Brezausek manifestly acted "more as an advocate than a doctor rendering objective opinions." *Davis*, 444 F.3d at 578.

## B. Significance of SSA findings

Miller next contends that Hartford lacked a reasonable basis for rejecting the SSA's finding of total disability. "An administrator is not forever bound by a Social Security determination of disability, but an administrator's failure to consider the determination in making its own benefit decisions suggests arbitrary decisionmaking." *Holmstrom*, 615 F.3d at 772–73.

In *Holmstrom*, "the Social Security determination was made under a similar or more stringent disability definition[.]" *Id.* at 773. Here, Hartford noted in its decision on remand that, despite finding total disability, the ALJ found that Miller "has the residual functional capacity to perform sedentary work[.]" (R. 1005, ECF No. 49-4 at 159.) Hartford further noted that the ALJ considered that Miller "was an individual closely approaching advanced age on the established disability onset date," but the Plan "does not use an Insured's age as a factor in determining ability to work." (*Id.*) Hartford's record-reviewing rheumatologist Dr. Kretzmann provided further reasons for departing from the SSA's findings, stating that he "gave little weight to [Miller's] SSDI decision as this decision was based upon factors other than the claimant's rheumatologic condition and screening exam reflective of a Light and Sedentary Level of work activity." (R. 2056, ECF No. 49-8 at 130.) This case is thus distinguishable from *Holmstrom*, where the administrator "never stated why it disagreed with the Social Security determination[.]" 615 F.3d at 773.

The ALJ determined that Miller

> has the residual capacity to perform sedentary work . . . except that [Miller] can occasionally climb ladders, ropes, scaffolds, ramps and stairs,

and can occasionally balance, stoop, kneel, crouch, and crawl. [Miller] should avoid concentrated exposure to vibration and dangerous workplace hazards such as exposed moving machinery and unprotected heights. [Miller] can understand and remember simple instructions and carry out simple, routine tasks that require little independent judgment or decision making at an average production rate pace, but should not perform tasks with stringent speed or strict rate based production requirements and involving few if any daily changes in a work task or work environment. [Miller] can have occasional interaction with the public and frequent interaction with coworkers and supervisors.

(R. 1119, ECF No. 49-4 at 273.) The ALJ concluded that Miller's "past relevant work could no longer be performed" because the past relevant work was sedentary, semi-skilled work while Miller's residual functional capacity was sedentary, unskilled work. (R. 1124, ECF No. 49-4 at 278.)

The ALJ's determination differed from Hartford's because the ALJ considered Miller's age, as Hartford noted in its denial letter, but also because the ALJ considered Miller's claimed mental impairments. The ALJ found "mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration." (R. 1119, ECF No. 49-4 at 273.) But on administrative remand in this case, Miller expressly disclaimed any mental disability, presumably to avoid the Plan's 24-month cap on benefits for disability due to "Mental Illness that results from any cause" or "any condition that may result from Mental Illness." (R. 239, ECF No. 49-1 at 241.) This difference alone would appear to reconcile the ALJ's finding that Miller was capable of performing sedentary, unskilled work with Hartford's finding that Miller was capable of performing the essential duties of her occupation—sedentary, semiskilled work.

36

But beyond the differences between the Social Security standard and the Plan's standard and the differences between Miller's claims in each instance, there is a more fundamental reason that Hartford's findings could justifiably diverge from the SSA's findings: evidence that Miller and Dr. Brezausek substantially and systematically overstated Miller's limitations. At the hearing, Miller "testified that she could sit for less than thirty minutes and walk to the mailbox" and that "she spends most of the day sleeping and does not perform household chores due to her conditions," while she reported to her bariatric surgeon's office that she was in the midst of a six-month long exercise regimen involving walking 8,000 to 13,000 steps daily, biking one hour daily, exercising in the pool for one hour, two to three times per week, and resistance training three times per week.

Hartford had to—and did—consider the SSA's findings; it did not have to close its eyes to record evidence contradicting the SSA's findings. Hartford's principled disagreement with the SSA's findings does not support a finding that Hartford's decision was arbitrary and capricious.

## C. Hartford's record reviewers' focus on normal findings

Miller contends that the main symptoms of fibromyalgia are tenderness to touch or pressure affecting joints and muscles, fatigue, sleep problems, and problems with memory or thinking, and that Hartford abused its discretion by relying on reviewing physicians who insisted on findings that are not relevant to fibromyalgia. (Pl.'s Mem. at 11, 32–33, ECF No. 51 at 11, 32–33.) But Miller did not claim disability based on

fibromyalgia alone; she also claimed to be disabled due to psoriatic arthritis, depression, panic attacks, sleep apnea, chronic fatigue syndrome, osteoarthritis, and chronic pain. (*See* Pl.'s Mem. at 2, ECF No. 51 at 2; R. 1215, ECF No. 49-5 at 87.) Given Miller's claims, Hartford's reviewing rheumatologists' consideration of the lack of objective medical evidence to support functional limitations due to psoriatic arthritis or osteoarthritis was not unreasonable; to the contrary, it was part and parcel of a full and fair review of Miller's claim.

With respect to Miller's fibromyalgia, the record-reviewing physicians did not cite the lack of abnormal findings to refute the *diagnosis* of fibromyalgia, but to refute the claimed functional limitations due to Miller's fibromyalgia. Dr. Alghafeer, for instance, rejected Dr. Brezausek's opinion that Miller was effectively bedridden because there was no evidence of de-conditioning. Likewise, both Dr. Alghafeer and Dr. Kretzmann rejected Dr. Brezausek's total work activity restriction because such complete restriction is contraindicated for fibromyalgia: "the treatment for this condition includes normal, scheduled activity," (R. 2058, ECF No. 49-8 at 132), and "prolonged lack of exercise exacerbates physical weakness and adherence to a graded exercise therapy alone can be beneficial," (R. 657, ECF No. 49-3 at 83).

### D. Hartford's consideration of complaints of pain

Miller contends that Hartford's record-reviewing physicians rejected Miller's complaints of pain due to their subjective nature. Given the abundant evidence recounted above that Miller and Dr. Brezausek substantially and systematically overstated Mil-

ler's functional limitations, including Miller's testimony—while engaged in an intensive six-month long exercise regimen—that she "could sit for less than thirty minutes and walk to the mailbox" and that "she spends most of the day sleeping and does not perform household chores due to her conditions," it was not unreasonable for Hartford and its record-reviewing physicians to discount Miller's self-reported symptoms.

### E. Lack of evidence of improvement in Miller's condition

Miller contends that, because Hartford initially approved Miller's claim, it abused its discretion by terminating her benefits without substantial evidence that Miller's condition improved. (ECF No. 51 at 26–27.) But the previous payment of benefits "does not create a presumptive burden for the plan to overcome." *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 832 (7th Cir. 2009). Indeed, Hartford was "entitled to seek and consider new information and, in appropriate cases, to change its mind." *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 364 (7th Cir. 2017) (quoting *Holmstrom*, 615 F.3d at 767). And, for all the reasons discussed above, Hartford's decision here to change its mind and terminate Miller's benefits was reasonable.

### F. Reliance on evidence not cited in denial letters

Miller contends that Hartford may not now rely in this litigation on evidence of Miller's extensive travel and on evidence of Miller's exercise regimen in preparation for bariatric surgery because Hartford did not rely on such evidence in its various denial letters. A plan administrator must notify a claimant of the "specific reason or reasons for the adverse determination," 29 C.F.R. § 2560.503–1(g)(1)(i), but ERISA

does not "require the plan to identify each and every piece of evidence that it relied upon in reaching its decision to deny benefits," *Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012). Plan administrators, in other words, "need not explain the reasoning behind their reason." *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 694–95 (7th Cir. 2005) (citing *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)).

"When challenged in court, the plan administrator can defend his interpretation with any arguments that bear upon its rationality. He cannot augment the administrative record with new facts bearing upon the application for benefits . . . but he is not limited to repeating what he told the applicant. All he has to give the applicant is the reason for the denial of benefits; he does not have to explain to him why it is a *good* reason." *Gallo*, 102 F.3d at 923.

Hartford's reason for terminating Miller's benefits has never changed: she did not continue to be disabled as defined by the Plan beyond May 6, 2015. Now challenged in court, Hartford may defend its decision with "any arguments that bear upon its rationality." *Id.* The records from Miller's bariatric surgeon are not "new facts" that "augment the administrative record"; rather, they were part of the record on remand and cited by Dr. Kretzmann. (R. 1022, ECF No. 49-4 at 176; R. 2051, ECF No. 49-8 at 125.) Miller even refers to the bariatric surgery in her opening brief. (ECF No. 51 at 20.) Hartford was entitled to cite record evidence in support of its reason for terminating benefits. As for Miller's alleged travel, the Court has not considered that

evidence; the rationality of Hartford's decision is amply supported by the rest of the record.

Miller further argues in reply that "a claimant's ability to engage in limited therapeutic activities is not a proper basis for determining that the claimant is not disabled." That may well be so. But where, as here, the claimant and her treating physician repeatedly claim (including testimony at an SSA hearing) that she is effectively bedridden, the claimant's contemporaneous, intensive, six-month long exercise regimen is profound evidence that the claimant's self-reported symptoms and limitations are unreliable. Moreover, her rigorous physical regimen supports the conclusions of other reviewing physicians, including Drs. Alghafeer, Kretzmann and Lewis, that there was no objective evidence for imposing total work activity restrictions. Having properly discounted Miller's self-reported symptoms and limitations, as well as Dr. Brezausek's opinions based predominately on those self-reports, Hartford was justified in terminating benefits in the absence of objective evidence of functional impairment.

## IV. Conclusion

For the reasons above, Hartford's Motion for Summary Judgment (ECF No. 52) is **granted**, Plaintiff's Motion for Summary Judgment (ECF No. 50) is **denied**, Plaintiff's Motion for Oral Argument (ECF No. 54) is **denied as moot**, and Plaintiff's claims are **dismissed** on the merits with prejudice. Hartford's request for attorney's fees under 29 U.S.C. 1132(g) is **denied.** Final judgment will be entered separately.

**SO ORDERED.**

Date:  3/25/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Warren von Schleicher
SMITH von SCHLEICHER & ASSOCIATES
warren.vonschleicher@svs-law.com